# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

DAVID AL-WATAN, TALAL CHOLAGH,
ALI ALZEREJ, HASAN AL-ZEREJ,
MOHAMMED AL-SAEDY, and      Case Number: 07-14687
HUSSEIN ALSALIH,

                     JUDGE PAUL D. BORMAN
           Plaintiffs,         UNITED STATES DISTRICT COURT

v.

AMERICAN AIRLINES, INC.,

           Defendant.
_____ /


## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT


On October 31, 2007, Plaintiffs filed the instant Complaint in this Court, alleging the

following causes of action:

| | |
|---|---|
| Count I: | 49 U.S.C. § 40127, Discrimination in Air Transportation |
| Count II: | 42 U.S.C. § 2000a, Discrimination in Places of Public Accommodation |
| Count III: | 42 U.S.C. § 1983, Violation of Civil Rights under Color of State Law |
| Count IV: | 42 U.S.C. § 1981, Denial of Equal Rights under the Law |
| [No Count V] | |
| Count VI: | False Imprisonment (state law) |
| Count VII: | Intentional Infliction of Emotional Distress (state law) |
| Count VIII: | Negligence (state law). |

Before the Court is Defendant American Airlines, Inc.'s Motion for Summary Judgment

under Fed. R. Civ. P. 56(b), filed November 14, 2008.  (Doc. No. 62).  Plaintiffs responded on

December 15, 2008.  (Doc. No. 66).  The Court heard oral argument on Defendant's Motion on

February 6, 2009.  For the reasons discussed below, this Court **GRANTS** Defendant's Motion for

Summary Judgment.

## I. BACKGROUND

On August 28, 2007, Plaintiffs were scheduled to take Defendant's flight 590 from San Diego to Chicago. (Compl. ¶ 8). Plaintiffs, employees of DTC, a security contractor, were returning together from a training session with the United States military. (Pl.'s Resp. Ex. A, San Diego Harbor Police Officer's Narrative Report). Plaintiffs are all of Iraqi descent. (Compl. ¶ 22).

Prior to boarding the flight, a passenger on the flight, while still at the gate spoke to one of Defendant's customer service managers, Anne Grove, and to the police, to express her concern about four men, identified as Middle Eastern, who appeared to be acting suspiciously. (Pls.' Resp. Ex. B, Grove Report; Ex. C, Grove Dep. 33-34). Grove and the police officers spoke to the passenger, who complained that the men were speaking to each other in their native language. (Grove Report). The police officers told the passenger that they had no reason to question or detain the men, as they had cleared security without incident and were not displaying any cause for intervention. (*Id.*) Grove reported that everything appeared normal to her, and no other passengers complained. (*Id.*)

Plaintiffs boarded the plane without incident, and took their seats. (Compl. ¶ 10). Plaintiffs were not assigned to sit together. (*Id.*)

Upon boarding, the passenger who complained at the gate decided that she did not want to take the flight, and asked to deplane. (Def.'s Mot. Summ. J., Ex. A, Plummer Dep. 35-36). She told the flight attendant that one of the men she complained about at the gate glared at her and her children, then went to the lavatory, and when he returned to his seat, he put a blanket over his head. (*Id.*) The passenger and her children deplaned.

Flight Attendants Ann Saltzman and Anthony Kotsonis also saw the man, Plaintiff Al-Watan,

2

go to the lavatory at the rear of the plane shortly before departure.  (Def.'s Mot. Summ. J., Ex. C, Saltzman Dep. 20-21; Ex. E, Kotsonis Dep. 28).   All of the three flight attendants on board, Saltzman, Kotsonis and Lead Flight Attendant Kenneth Koc, saw Al-Watan sitting in his seat with his head covered with a blanket.  (Saltzman Dep. 31-32; Kotsonis Dep. 37-38; Def.'s Mot. Summ. J., Ex. B, Koc Dep. 33).  Koc testified "It looked to me like a mummy.  It was over and down around the – it was just strange."  (Koc Dep. 37).  Kotsonis also testified  that the blanket completely covered Al-Watan's entire body and Kotsonis believed "he was hiding or appeared to be hiding." (Kotsonis Dep. 34, 37).

Al-Watan testified that he used the bathroom while passengers were still boarding the plane, and that he had covered his head with a blanket because he was exhausted and wanted to take a nap. (Def.'s Mot. Summ. J., Ex. D, 54-55).

The flight attendants informed Captain Plummer about the passenger who deplaned, the reasons for her departure, and Al-Watan's actions.  (Plummer Dep. 35-36).  Thus, the flight captain was aware Al-Watan was of Middle Eastern descent.  (*Id.* at 58).  After a discussion, during which the captain asked the flight attendants whether they "felt comfortable with the situation at the time," and the flight attendants stated that they did not have a problem, the captain decided to proceed with the flight.  (*Id.* at 35, 37).

<u>First Call to Captain Plummer</u>

As the plane began to taxi, Lead Flight Attendant Koc called Captain Plummer and told him that during the safety demonstration, Plaintiff Al-Watan, the individual who had been previously sitting in his seat with his head covered by a blanket, had removed the blanket and now had leaned out into the aisle and stared directly at him.  (Plummer Dep. 42).  Koc testified, "I was startled as

3

I looked down the aisle to see the passenger in 14D, who was now uncovered by the blanket, leaned over with his head out in the middle of the aisle staring intently at us." (Koc Dep. 42).

Flight Attendant Saltzman also noticed Al-Watan leaning out into the aisle during the demonstration, and she "thought it was a little bit strange that we were being . . . tracked with his eyes . . . and the demeanor when we were getting the look, the evil eye, if you want to call it." (Saltzman Dep. 32).

### Second Call to Captain Plummer

Flight Attendant Koc called Captain Plummer a second time while the plane was taxiing and informed him that yet another man watched the flight attendants' safety demonstration in a way that disturbed the flight attendant. (Plummer Dep. 43). Flight attendant Anthony Kotsonis testified that during the demonstration he noted the passenger in seat 22F "glaring at [him] in a manner that actually scared me." (Kotsonis Dep. 38). Kotsonis stated that the passenger appeared agitated, flushed and was sweating. (*Id.*) Kotsonis testified that the passenger glared at him – "agitated, mean facial expression." (*Id.* at 39). The passenger in 22F was Mr. Wessa Althwej, who is not a party in this case. (San Diego Harbor Police Officer Adauto's Narrative Report 1). Flight Attendant Kotsonis, who had observed Althwej directly, and had also heard about Al-Watan's actions, stated that when the flight attendants talked on the plane about the staring passengers, "[i]t was like each of those [Arabic] passengers had their assigned attendant." (*Id.* at 3).

### Third Call to Captain Plummer

As the plane approached the runway, Captain Plummer received yet another call, this time from Flight Attendant Saltzman. (Plummer Dep. 44). Saltzman told the captain that a passenger, Paul Coslick, who identified himself as a Lieutenant in the U.S. Navy, told her that he was very

concerned about the man sitting next to him because the man told him that he was traveling alone, while Coslick had seen the man with a group of other passengers, including Al-Watan, at the gate. (*Id.* at 44, 46). Coslick testified that he noted that his seatmate came to the airport with five or six other men. (Coslick Dep. 27).

When Flight Attendant Saltzman was asked at her deposition why it alarmed her to learn that Coslick's seatmate was being inconsistent or untruthful about who he was traveling with, she testified:

> Well, because from past experience people – I mean, it's well-known now that a lot of terrorist groups are well-organized, they travel in groups and try to keep their identity hidden from other people by sitting in different parts of the aircraft, which is one of the things that we are aware of as flight attendants to be on the look out for.

(Saltzman Dep. 40).

The passenger to whom Coslick had spoken, the subject of his complaint, was Plaintiff Talal Cholagh. (San Diego Harbor Police Officer Ada Narrative Report 2). Cholagh told the San Diego Harbor Police that after he boarded the plane the passenger behind him, Coslick, "'asked about 50 questions' about his work, where he lived, where he was going, and who he was flying with." (*Id.*) Cholagh also told the police that he felt uncomfortable answering the questions posed by the stranger, and did not want to give out too much information because Cholagh is a contractor for the military. (*Id.*)

### Captain Plummer Decides to Return to the Gate

After the third phone call, Captain Plummer decided to return the plane to the gate to "sort everything out." (Plummer Dep. 49). Captain Plummer testified that he decided to return to the gate because of the information he received in the multiple calls from the flight attendants. (*Id.* at 50). This included the fact that Plaintiff Al-Watan was Middle Eastern and appeared to be traveling with

three other males.  (Plummer Dep. 39).

Captain Plummer was processing the previously noted phone call information in the context of his 20 years of experience as a pilot.  Captain Plummer testified that he decided to return to the gate out of safety concerns:

1. "I needed to know if there was any connection with these people traveling as a group but saying they were traveling alone."  (Plummer Dep. 53).

2. Something this bad never happened to him in twenty years of being a pilot. "I would have to say return to the gate because of the unusual behavior that we were being exposed to that evening."  (Plummer Dep. 66).

3.  He felt that the safety of the plane and its passengers was threatened,  "[b]y the odd behavior of the passengers that I received these calls about."  (Plummer Dep. 68).

4.  "Their unusual behavior and the fact that they said they were traveling alone but the were actually in a group."  (Plummer Dep. 68).

5.  Captain Plummer recounted the unusual behavior: First, place a blanket over his head at his seat.  Second, stare intently at a flight attendant – gaze never left.  Third, next to Coslick– not traveling with anyone.  Coslick saw him with a group. (Plummer Dep. 80).

Once the plane returned to the gate, American Airlines Customer Service Manager Ann Grove called the police; either the first officer or the pilot or both had asked her to call the police. (Grove Dep. 65).

As all of the passengers exited the plane, the flight attendants pointed out the six Plaintiffs

6

and one other man of Arabic descent on the flight, and the men were called over and talked to by the police. (Al-Watan Dep. 75; Def.'s Mot. Summ. J. Ex. I, Al-Zerej Dep. 35). There is no evidence that Defendant's representatives or agents told the police to arrest the Plaintiffs.

The police officers questioned the men for up to two hours, after which they determined that no criminal activity had occurred, and released the men. (Al-Watan Dep. 89; San Diego Harbor Police Officer's Narrative Report 1). Officer Adauto's report noted that Plaintiff Al-Watan "had red watery eyes and had the odor of an alcoholic beverage on his breath." (Pls.' Resp. Ex. A, p 1).

The flight did not depart that evening because of a San Diego imposed late night curfew on flight activity. All passengers spent the night in San Diego.

Flight Attendant Saltzman testified that the flight crew was "verbally accosted out at the front of the airport while we were waiting for our hotel pickup by man [Al-Watan] in 14D." (Salztman Dep. 12). Plaintiff Al-Watan was waiting in front of the airport for Fox News to show up for an interview. (Pls.' Resp. Ex. A, Officer Adauto's Report, p. 3).

Flight 590 was rescheduled for the next morning. (Al-Watan Dep. 104-105). All of the Plaintiffs and the other passengers boarded the flight and flew to Chicago without incident. (*Id*. at 105-106).

On November 14, 2008, Defendant moved for summary judgment on the following grounds: 1) under 49 U.S.C. § 44902(b) it is immune from liability for the captain's decision to return the plane to the gate and remove Plaintiffs for questioning unless the captain's decision was arbitrary or capricious, and Plaintiffs cannot show that the captain's decision was arbitrary or capricious; 2) Plaintiffs' state law claims are based on the captain's decision; and therefore, are foreclosed because the captain's decision was not arbitrary or capricious; and 3) Plaintiff's state law claims are

preempted by federal law.

## II. STANDARD OF REVIEW

The United States Court of Appeals for the Sixth Circuit has summarized the legal standard

for summary judgment motions as follows:

> Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In reviewing a motion for summary judgment, we view the evidence, all facts, and any inferences in the light most favorable to the nonmoving party. "To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact." A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]."

*Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 500-01 (6th Cir. 2007) (internal citations

omitted).

## III. ANALYSIS

### A.    Plaintiffs' Discrimination Claims

Plaintiffs allege that Defendant discriminated against them based on their race, color or

national origin, in violation of 49 U.S.C. § 40127, prohibition on discrimination in air transportation

and 42 U.S.C. § 2000a, prohibition against discrimination or segregation in places of public

accommodation. (Compl. ¶¶ 31, 35, 38, 40). Plaintiffs also allege that Defendant violated their

civil rights, 42 U.S.C. § 1983, and denied them equal rights under the law, 42 U.S.C. § 1981, based

on their race, color or national origin. (Compl. ¶¶ 43, 45, 48, 49).

The Airline Deregulation Act, 49 U.S.C. § 40101, et seq. contains a provision prohibiting

discrimination in air transportation. The provision reads:

> (a)     Persons in air transportation. -- An air carrier or foreign air carrier may not subject a person in air transportation to discrimination on the basis of race, color,

national origin, religion, sex, or ancestry.

49 U.S.C. § 40127(a).

Defendant argues that it is not subject to liability for its employees' actions, pursuant to 49 U.S.C. § 44902(b), unless Plaintiffs show that the captain's decision to refuse to transport Plaintiffs was arbitrary and capricious. (Def.'s Br. 6). Title 49 U.S.C. § 44902(b) states: "Permissive refusal.--Subject to regulations of the Under Secretary, an air carrier, intrastate air carrier, or foreign air carrier may refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety."

Plaintiffs do not allege a claim for refusal to transport; instead, Plaintiffs allege illegal and discriminatory activity after the passengers disembarked from the plane. (Pls.'Resp. 11). The Court's analysis, however, must include the activity on the airplane, which triggered the activity after the Plaintiffs and the rest of the passengers disembarked.

In their Complaint, Plaintiffs allege that "without any proper justification, Defendants feared Plaintiffs as a threat to security," and "[a]s a result of Defendants' discrimination and unjustified actions, the passengers of flight 590 were required to deplane." (Compl. ¶¶ 16, 19).

Plaintiffs further allege that upon disembarking they were "pulled aside," physically separated from the other passengers, "detained and interrogated." (Compl. ¶¶ 20, 23). Plaintiffs do not allege that Defendant refused to transport them. In fact, Plaintiffs acknowledge that they completed their travel plans the next day--with the same passengers, on that very same flight. (Compl. ¶ 29; Al-Watan Dep. 104-106). However, Plaintiffs' Complaint relates to Defendant's refusal to transport them that night.

Plaintiffs argue that the captain's decision to return to the gate, which they assert "may" be

9

protected by § 44902, is unrelated to "summoning police and interrogating suspected terrorists." (Pls.' Resp. 12).  The Court finds that this ignores the totality of the circumstances relevant to the instant case.

Defendant argues, "Captain Plummer's decision to have Plaintiffs questioned by law enforcement in the gate area is inextricably intertwined with, and the logical extension of, his decision to return the aircraft to the gate."  (Def.'s Reply 3).  Plaintiff's counsel conceded this in his argument to the Court at a discovery hearing:

> What I want is documents that deal – that deal with the decision to return to the gate. That is the gravamen of this entire lawsuit.  We say the decision to return to the gate was based off of racial discrimination; they say it was something else. . . .  That's not that broad Judge, and it should be right in the heart of the case.

(11/6/08 Motion Hrg. Before Magistrate Judge Steven Whalen Tr. 8-9, Lawrence T. Garcia, Counsel for Plaintiff).

Plaintiffs ultimately were not refused transport, because all the passengers on the plane were required to deplane and wait overnight for the next flight because the airport curfew prevented a departure after the plane returned to the gate.  (Pls.' Resp. 13; Plummer Dep. 70).  The suspicious conduct involving some of the Plaintiffs was the reason Captain Plummer decided to return to the gate to further investigate the suspicious conduct.

The issues are, thus, two-fold: first, was the Captain's decision to return to the gate arbitrary and capricious; second, did Defendant's conduct upon returning to the gate violate the Plaintiffs' rights.

The Court must separately evaluate Defendant's post-return conduct and the conduct of the police, unless there is evidence that Defendant controlled the police or ordered/requested the police to act in a specific manner that supports Plaintiffs' claims.

10

This Court's Opinion and Order of July 28, 2008 Denying Defendant's Motion to Dismiss (Doc. No. 49), in the instant case adopted the arbitrary and capricious standard applied by the U.S. Court Appeals for the Second Circuit in *Williams v. Trans World Airlines*, 509 F.2d 942, 948 (2d Cir. 1975):

> The test of whether or not the airline properly exercised its power under [§ 44902] to refuse passage to an applicant or ticket-holder rests upon the facts and circumstances of the case as known to the airline at the time it formed its opinion and made its decision and whether or not the opinion and decision were rational and reasonable and not capricious or arbitrary in the light of those facts and circumstances. They are not to be tested by other facts later discovered by hindsight.

This Court's Opinion and Order of July 28, 2008 denying Defendant's Motion to Dismiss adopted this test, and then, after noting that the Sixth Circuit has not ruled on this issue, quoted approvingly at length from the recent First Circuit opinion in *Cerqueira v. American Airlines, Inc.*, 520 F.3d 1 (1st Cir. 2008). The Court's July 28, 2008 Opinion stated:

> The Sixth Circuit has not yet addressed the substantive analysis to be applied when a passenger alleges that an airline, citing security concerns, impermissibly removes him or her from an airplane on the base of race or national origin. In the recent case *Cerqueira v. American Airlines, Inc.*, 520 F.3d 1 (1st Cir. 2008), the First Circuit utilized the following analysis when evaluating a claim of discrimination under § 1981 when the airline asserts its statutory authority under § 44902(b):
>
>> As a matter of federal policy, under the Federal Aviation Act, "assigning and maintaining safety [ranks] as the highest priority in air commerce." Thus, the highest priority is assigned to safety, even though the federal aviation statute also has a general prohibition on race and national origin discrimination. "An air carrier . . . . may not subject a person in air transportation to discrimination on the basis of race, color, national origin, religion, sex or ancestry." Plaintiff's suit is brought under 42 U.S.C. § 1981. . . .
>>
>> In 49 U.S.C. § 44902(a), which became effective in 1961, Congress mandated air carriers to refuse to transport passengers and property where a passenger does not consent to a search of his person or property for dangerous weapons, explosives, or destructive substances. In addition to mandating that some passengers be refused

11

transport, Congress also authorized, at subsection (b), air carriers to engage in "permissive refusal":

Subject to regulations of the Under Secretary, an air carrier, intrastate air carrier, or foreign air carrier may refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety.

Thus Congress supplemented the discretion airlines already had under common law to exclude certain passengers, in light of their duty of utmost care to all passengers. It is obvious that § 44902(b) was enacted in furtherance of the first priority of safety in air traffic. The legislative history confirms this.

The permissive refusal authorization in § 44902(b) has several distinct components. The statute says the air carrier "may" refuse to transport, thus vesting discretion over the decision in the air carrier. That discretion is very broad. The carrier need not decide that the passenger or property *is* inimical to safety; the authorization extends to situations in which the carrier decides the passenger or property "might be" inimical to safety. The congressional authorization is granted to the air carrier to make the decision. The only limit contained in the statute on that discretion is that it be subject to regulations of the Under Secretary of Transportation for Security.

In turn, the Under Secretary has not promulgated regulations limiting the airline's discretion directly under 49 U.S.C. § 44902(b). However, one other regulation is directly pertinent, as it states that:

The pilot in command of an aircraft is directly responsible for, and is the final authority as to the operation of that aircraft.

In other words, the pilot in command stands in the role of the air carrier for a decision to remove a passenger from a flight. The authorization in § 44902(b) also applies to decisions by others than the pilot not to rebook a passenger based on safety concerns. In this case, that decision was made by another person, based on information from the pilot.

While it is true, as amicus for plaintiff points out, that the statute refers to the air carrier's decision, the appropriate focus is on the actual decisionmaker: the pilot in command of the aircraft where the passenger is removed from the pilot's flight. That is so as a matter of law under 14 C.F.R. § 91.3. In practice in this context, it is not the air

12

carrier that makes the decision to refuse transport to the passenger on the flight, but the pilot in command, who acts for the air carrier.

Section 44902 itself does not provide for judicial review of decisions to refuse transportation by the pilot in command. Nonetheless, courts have entertained actions involving § 44902(b) brought under other general statutes which prohibit discrimination, such as § 1981 and Title VI of the Civil Rights Act.

Accordingly, the parties have assumed that the protections of 49 U.S.C. § 44902 and the U.S. Department of Transportation administrative enforcement mechanisms to protect the rights of passengers, 49 U.S.C. §§ 46101, 46301, do not preclude the filing of actions under 42 U.S.C. § 1981, and we will assume the same. It is clear that § 44902(b), being the more specific statute, applies to this case. Congress has, by statute, explicitly given safety the highest priority.

Some courts have described an air carrier's reliance on § 44902(b) as a defense in the nature of an immunity. In our view, § 44902(b) does not merely create a defense: the statute is an affirmative grant of permission to the air carrier. Congress specifically authorized permissive refusals by air carriers; Congress did not say § 44902 was merely creating a defense. It is the plaintiff who carries the burden to show that § 44902(b) is inapplicable.

The courts, by judicial construction of § 44902(b), have adopted a standard for liability for an airline's permissive refusal to transport decisions. This standard reconciles the primary priority of safety with other important policies, such as § 1981's prohibitions on racial discrimination. The standard most frequently articulated is that developed by the Second Circuit in *Williams:* that the air carrier's decision to refuse air transport must be shown to be arbitrary or capricious. The arbitrary or capricious standard was later adopted by the Ninth Circuit in *Cordero v. Cia Mexicana De Aviacion, S.A.* We agree with *Williams* and hold that an air carrier's decisions to refuse transport under § 44902(b) are not subject to liability unless the decision is arbitrary or capricious. There is no need here to repeat the cogent reasoning in *Williams.*

We also agree with *Williams* that Congress did not intend the non-discrimination provisions of the FAA or of § 1981 to limit or to render inoperative the refusal rights of the air carrier. Congress left decisions to refuse passage to the air carrier, and any review in the

13

> courts is limited to review for arbitrariness or capriciousness.
> Congress was also well aware that the air carriers' decisions to deny
> transport have to be made very quickly and based on limited
> information. Section 44902(b) must be interpreted in that light.
> Congress "did not contemplate that the flight would have to be held
> up or cancelled until certainty was achieved."

> *Id*. at 11-15 (emphases in original) (internal citations and footnotes omitted), *reh'g
> en banc denied,* 520 F.3d 20 (1st Cir. 2008).

*Al-Watan v. American Airlines, Inc*., 570 F. Supp.2d 925, 923-32 (E.D. Mich. 2008).

In applying 49 U.S.C. § 44902(b), this Court will utilize the arbitrary and capricious standard in deciding whether to grant Defendant's Motion for Summary Judgment.

Thus, this Court must decide whether Plaintiffs have proffered sufficient evidence to create a genuine issue of material fact that Captain Plummer's decision, given the facts he knew at the time he made the decision to return to the gate, was arbitrary and capricious.

A decision to refuse to transport a passenger that is motivated by the passenger's race is "inherently arbitrary and capricious." *Shqeirat v. U.S. Airways, Inc.*, 515 F. Supp. 2d 984, 1004 (D. Minn. 2007). A refusal to transport "cannot give rise to a claim for damages under . . . federal . . . law unless the carrier's decision was arbitrary and capricious." *Schaeffer v. Cavallero*, 54 F. Supp.2d 350, 351 (S.D.N.Y.1999) citing *Williams v. Trans World Airlines*, 509 F.2d 942, 948 (2d Cir.1975); *see also*, *Al-Qudhai'een v. America West Airlines, Inc.*, 267 F. Supp.2d 841, 846 (S.D. Ohio 2003).

In support of its argument that the captain's decision was not arbitrary and capricious, Defendant relies primarily on two cases: *Cerqueira v. American Airlines, Inc.*, 520 F.3d 1 (1st Cir. 2008) and *Dasrath v. Continental Airlines, Inc.*, 467 F. Supp. 2d 431 (D. N.J. 2006). In both cases, after reviewing the information relayed to the captain by the crew, the courts held that the captain's decision to refuse transport was not arbitrary and capricious.

14

In *Cerquira*, 520 F.3d at 4-7, three passengers were removed from the plane for questioning by the state police[1] based on the following facts: 1) one of the passengers approached the captain before the flight and asked him if he was the captain for the flight and asked the same question when he boarded the flight; 2) a different passenger had been hostile to a flight attendant about a seat change, and then he boarded the plane with the first class passengers, even though he was in coach, and immediately went to the bathroom for an extended period of time; 3) two of the three passengers were acting "very bizarrely and asking questions such as 'Is this how you want me to do it?'"; 4) one of the passengers asked strange questions during the exit row safety briefing and laughed; 5) one of the passengers stared at a flight attendant during the general safety demonstration; and 6) the three passengers wished the other passengers "Happy New Year" in a "'very boisterous' manner."

The First Circuit concluded that "there is absolutely no evidence that the Captain himself or the [System Operations Control] manager had discriminatory animus, let alone that their decisions to refuse to transport a passenger, which were made under time pressure, were based on any discriminatory animus," and stated that the Captain's decision was justified given the safety concerns observed by the crew, which are recounted above.  *Id.* at 17.

The First Circuit held:

> Review of a decision to refuse transport by the Captain is restricted to what information was actually known by the decisionmaker at the time of the decision. The test is not what the Captain reasonably *should* have known. . . . The Captain (or other decisionmaker) is entitled to accept at face value the representations made to him by other air carrier employees.  Thus, even mistaken decisions are protected as long as they are not arbitrary or capricious.

---

[1]The three men in *Cequira* were removed "to a secured location away from the gate and apart from the other passengers and were questioned by one of the State Police troopers."  520 F.3d at 14-15.

15

*Id.* at 14-15 (emphasis in original).  The First Circuit further held that the burden is on the plaintiff to show the decision not to transport was arbitrary and capricious.  *Id.* at 18.

In *Dasrath*, a female passenger alerted the gate agent to suspicious behavior by the plaintiff and two other male passengers, specifically that three men who apparently knew each other were pretending not to know each other and doing "funny things, talking on cell phones."  467 F. Supp. 2d at 437.  After one of the male passengers identified by the female passenger boarded the plane, he reached down and felt underneath a seat in first class.  *Id.* at 438.  He then moved to the rear of the plane where he removed his duffel bag from the overhead bin and placed it behind the exit row. *Id.* at 438.  Shortly thereafter, the captain saw the three men conversing; one of the men was perspiring heavily and would not stop looking at the captain.  *Id.* at 439.

The District Court in New Jersey held that the Captain acted reasonably when he removed the plaintiff, having removed the plaintiff only after being alerted to suspicious behavior that caused security concerns among the crew.  *Id.* at 449.  The court concluded that "there were many events that would have led a reasonable person to believe that the three men . . . were security risks."  *Id.* at 448.

The court stated:

[T]he undisputed facts as perceived by Captain Harris would preclude a jury from finding that he removed Mr. Dasarath from the aircraft for racial reasons or for any reasons other than concern for the security of the aircraft and the passengers.

*Id.* at 433.

The court in *Dasrath* also noted that like in *Al-Qudai'een*, 267 F. Supp. 2d 841, it was reasonable to remove additional passengers as well as the suspiciously-acting passengers because they were known to be flying together.  *Id.* at 438.

16

Defendant also cited to four other cases in which passengers were removed from a plane due to safety concerns. *In Williams*, *supra* at 947, the FBI informed the airline that the plaintiff was known to carry firearms, was schizophrenic and a dangerous person, and that his arrival at the Detroit airport was likely to produce a mass demonstration. The Second Circuit held that "there is no evidence that TWA was at any time influenced by race prejudice or discrimination in the slightest." *Id.* at 948.

In *Norman v. Trans World Airlines*, 2000 WL 1480367 at * 1 (S.D.N.Y. Oct. 6, 2000), a suit for breach of contract, gross negligence and intentional infliction of emotional distress, the plaintiff argued with a flight attendant, who then told the captain that the plaintiff interfered with his safety duties and would not complete the flight with the plaintiff on the plane. The district court concluded that the captain's decision was not arbitrary and capricious because the captain relied on the flight attendant's "representations regarding any potential safety threat posed by his conflict with [the Plaintiff]." *Id.* at 3.

In *Christel v. AMR Corp.*, 222 F. Supp. 2d 335, 338 (E.D.N.Y. 2002), a flight attendant reported to the captain that a disruptive passenger interfered with and distracted her from her safety-related duties by throwing a carry-on bag into the aisle and refusing to comply with her instructions. After the flight attendant alerted the captain to the situation, the captain decided to remove the plaintiff from the plane. *Id.* at 340. The district court concluded that the captain's decision was not arbitrary and capricious because "the record is devoid of any indication that [the captain's] decision to refuse [the plaintiff] transportation was 'retaliatory or malevolent. . . .'" *Id.* at 340.

17

Lastly, in *Al-Qudhai'een*, *supra* at 844, the plaintiff asked two of the flight attendants similar questions about the flight layover, disobeyed the flight attendant's order to remain in his seat and attempted to enter the cockpit. Taking into consideration all of the circumstances known to the captain at the time he decided to remove plaintiffs from the airplane and request a search of the plaintiffs' baggage, the district court concluded that the captain's decision was based on safety concerns and was not arbitrary and capricious. *Id.* at 847-48.[2]

In all of the cases cited by Defendant, there is one common fact: the passengers removed from the plane engaged in behavior that drew the attention of the flight attendants and justifiably alarmed them to the point that they contacted the pilot. Such is the case here. The flight attendants noticed the unusual and threatening behavior of plaintiffs Al-Watan and Cholagh, and non-party Wessa Althwej, who was seated in 22F, became concerned for the safety of the flight, and alerted Captain Plummer.

The flight attendants saw Al-Watan use the restroom, while the plane door was still open, return to his seat, put a blanket over his head, and then lean out into the aisle during the safety demonstration and stare at flight attendant Koc. (Plummer Dep. 40-41). Although use of the restroom is not a reason for concern, the placing of a blanket over the head before takeoff is a basis for concern, as is the leaning over into the aisle and staring menacingly at the flight attendant during safety instructions.

---

[2]"Taking into account all the circumstances known to Captain Patterson at the time he made his decision to radio America West for assistance and the fact that he is entitled to rely on the information provided to him by his crew despite any exaggerations or false representations, the Court finds as a matter of law that Captain Patterson's decision to remove Plaintiffs from the airplane and to request a search of their luggage was not arbitrary or capricious." *Al-Qudhai'een,* 267 F. Supp. 2d at 848.

During post-boarding pre-flight, another passenger, Althwej, stared at a flight attendant to the point of distracting him.  (Plummer Dep. 43).  In addition, a passenger reported his concern about the passenger sitting next to him because when he asked whether the passenger was traveling alone, the man responded that he was, but the reporting passenger had seen his seatmate with a group in the terminal, including Al-Watan.  (Plummer Dep. 44, 47).  What the pilot had on his "plate" was three calls from three different flight attendants, regarding suspicious or threatening behavior on board the aircraft even before it was off the ground.

All of these unusual actions by the passengers reasonably concerned the flight attendants, and justified their calls to the pilot.  Nothing in their calls can be regarded as evidencing discrimination. Captain Plummer emphasized in his deposition that the fact that the flight attendants called him at all was unusual because the flight attendants are not supposed to call the pilot when the doors are closed and the airplane is moving.  (Plummer Dep. 41).  The fact that Captain Plummer received not one, but three calls, from the flight attendants raised red flags about the safety of continuing the flight.  It was only after the third call that Captain Plummer returned the plane to the gate.

Based on the facts as Captain Plummer knew them to be when he decided to return the airplane to the gate, this Court holds that his decision was not arbitrary and capricious.  There is no evidence that it was based on Plaintiffs' race or ethnicity.  While Captain Plummer knew that Al-Watan was Middle Eastern, and he appeared to be traveling with at least three other men, the Plaintiffs' actions that impelled the three phone calls clearly establishes a reasonable basis for returning to the gate, and calling the police to find out information about the individuals.  (Pls.' Resp. Ex. G, Plummer's Report).

19

It is noteworthy that although Captain Plummer knew that a passenger [Leigh Williams] had an earlier negative interaction with Al-Watan at the gate, which was carried over on to the airplane, and that the passenger had deboarded with her children (Plummer Dep. 29-30), that incident did not factor into his ultimate decision.  Plummer relied on the subsequent information about the incidents on the plane that the flight attendants reported to him in the three phone calls.

The most significant suspicious uncontested information was that passenger Al-Watan had put a blanket over his head.  The actions of Al-Watan, Cholagh and Althwej reasonably appeared as linked in a rapidly evolving situation.  The totality of the circumstances supports Captain Plummer's decision to return to the gate out of safety concerns and request that the police talk to the individuals engaged in the suspicious activity, and other members of the group.  That all of these individuals were of Arabic ancestry is a factual reality.  However, Plaintiff has not presented any evidence of racial bias by Defendant.  Captain Plummer is entitled, and must be able, to implicitly rely on the information relayed to him by his flight crew, assuming it is reasonable and believable. The flight attendants are his eyes and ears in the passenger area of the airplane, while he is closeted in the cockpit.  *See Al-Qudhai'een*, 267 F. Supp. 2d at 848 (noting that a captain is "entitled to rely on the information provided to him by his crew despite any exaggerations or false representations"). Plaintiffs have not set forth evidence of racial bias by any of the flight attendants or the captain.

The Court must now examine for racial discrimination Defendant's actions after the plane returned to the gate.  (Pls.' Resp. 12).  Plaintiffs argue that the arbitrary and capricious standard in § 44902 does not extend to Captain Plummer's decision to call the police.  (*Id.*)  This Court disagrees.  As the court explained in *Ruta v. Delta Airlines, Inc.*, 322 F. Supp. 2d 391, 401 (S.D.N.Y. 2004), "if . . . the Captain's decision to have Plaintiff removed was not arbitrary or capricious then

it cannot have been arbitrary and capricious to call on law enforcement to enforce the Captain's decision."  Indeed, in this case, there is even less activity by the Captain; Captain Plummer did not decide that Plaintiffs should be refused transport– just interviewed by police before reboarding, which turned out, for all passengers on the plane, to be the next morning.

Plaintiffs raised a related argument pointing to discrimination: the fact that all seven Arab men on the flight were identified by Defendant's employees for questioning by police, after the plane returned to the gate, even though only three men, Al-Watan, Cholagh and Althwej engaged in suspicious behavior.  However, as noted before, there was evidence that the flight crew was aware that Plaintiffs were traveling together and this justified Defendant's identifying the group that included the suspicious individuals.

Plaintiffs contend that Defendant's flight attendants identified individuals of Arabic descent to the police for questioning.  Plaintiff Hassan Al-Zerej testified, "we were pointed at by the police and the flight attendants and separated from the rest [of the passengers][.]"  (Def.'s Br. Ex. I, Al-Zerej Dep. 31).  Also, Al-Watan testified that an employee of Defendant pointed at him and, "delivered us to the police."  The police proceeded to question the individuals.

This raises the issue of whether Defendant is responsible for conduct of the police, insofar as Plaintiffs allege that the police violated their rights.  In addition, there is a question whether Defendant can be charged under 42 U.S.C. § 1983 as a state actor.  There is no question that when a defendant reasonably believes that passengers have engaged in suspicious behavior, the passengers can be questioned by police. *See Cerqueira*, 520 F.3d at 8; *Al-Qudhai'een*, 267 F. Supp. 2d at 844; *Christel*, 222 F. Supp. 2d at 339; *Williams*, 509 F.2d at 946.  The flight attendants' identification of a group of passengers they believed were traveling together raises the issue of whether the

21

Defendant arbitrarily and capriciously identified all the Arab men on the flight for police questioning. To the extent that the six Plaintiffs were traveling together, there is no basis for finding the Defendant's decision to be arbitrary and capricious.  As to the seventh individual of Arabic descent that was apparently identified to the police by Defendant, that individual was reported by the flight attendant to the captain as having exhibited strange and threatening behavior.  There is no evidence supporting Plaintiffs' claim that Defendant acted in a discriminatory manner.  Accordingly, this Court will enter summary judgment on Plaintiffs' discrimination claims.

> **B.    Plaintiffs' Claim Under 42 U.S.C. § 1983**

Title 42 U.S.C. § 1983 only provides a remedy against persons acting under color of state law.  In *Ibrahim v. Dep't of Homeland Security*, 538 F.3d 1250 (9th Cir. 2008), the Ninth Circuit held that there was no valid § 1983 claim against United Airlines because her claim was based entirely on United's call to the local police.  *Id.* at 1257.  There was not in *Ibrahim*, nor is there in this case, any evidence that Defendant acted under guise of state authority or acted in concert with the San Diego Police.

Plaintiffs have not presented any evidence or argument that Defendant's refusal to transport them is attributable to a "state actor."  Defendant made the decision to cancel the flight and call the police.  Although Defendant pointed out Plaintiffs to the police, there is no evidence that Defendant directed the police officers to arrest Plaintiffs or otherwise directed the conduct of the police officers.

> **C.    Plaintiffs' State Law Claims**

22

Defendant argues that Plaintiffs' state law claims should also be dismissed because the Captain's decision was not arbitrary or capricious or, alternatively, because the state law claims are preempted by the Airline Deregulation Act, 49 U.S.C. § 41713(b). (Def.'s Br. 14). This Court holds that an airline's refusal to transport passengers cannot give rise to a claim for damages under either federal or state law unless the airline's decision was arbitrary and capricious. *See Schaeffer v. Cavallero*, 29 F. Supp.2d 184, 186 (S.D.N.Y.1998), citing *Williams v. Trans World Airlines*, 509 F.2d 942, 948 (2d Cir.1975) and *Adamsons v. American Airlines*, 444 N.E.2d 21 (N.Y. Ct. App. 1982). In this case, the Court finds that Defendant's action to return to the gate and call the police was not arbitrary and capricious; thus, Plaintiffs cannot prevail on their state law claims.

In addition, the Court agrees with the decision of the District Court in *Ruta v. Delta Airlines*, 322 F. Supp. 2d 392, 400-01 (S.D.N.Y. 2001), that all of the state tort claims are preempted. Any alleged emotional and physical harm allegedly suffered by Plaintiffs was a direct result of the Captain's decision to remove them from the plane, as were the claims for negligence and intentional infliction of emotional distress.

There is no factual support for Plaintiffs' claim of false imprisonment. Defendant merely called the police to talk to Plaintiffs; there is no evidence that Defendant suggested that the police arrest Plaintiffs.

This Court, therefore, enters summary judgment for Defendant on Plaintiffs' state law claims.

## IV. CONCLUSION

The Court concludes that information provided to Captain Plummer regarding the highly suspicious onboard conduct supports his decision to return to the terminal and to call the police to investigate. Plaintiff Al-Watan's placing a blanket over his head "mummy-like" prior to takeoff, leaning out into the aisle and staring menacingly at flight attendants, and the other actions discussed above is cause for concern; Captain Plummer's decision was not arbitrary and capricious. Certainly, the suspicious conduct at issue was not, as Plaintiffs' counsel characterized it at oral argument, "innocent" or "completely silly."[3]  (2/6/09 Mot. Hrg. 46).

There is no evidence that supports Plaintiffs' claim of discrimination by Captain Plummer. There is no evidence that Captain Plummer's action was race-based. The fact that the individuals who engaged in the suspicious conduct were of Middle Eastern/Iraqi descent does not support the conclusion that the decision to return to the gate was race-based rather than fact-based.

The three passengers of concern, based on their suspicious conduct, were Plaintiff Al-Watan, seat 14B; non-party Althwej in seat 22F; and Cholagh, the person seated next to Lieutenant Coslick in 31B. The six Plaintiffs were traveling together.

The police questioning, which occurred as a result of the justified suspicions of Captain Plummer, was tied to the question of whether to refuse passage to these men. Thus, the applicable standard to be applied in this case against Defendant, is whether Captain Plummer's conduct was arbitrary and capricious. What the Captain, and the Defendant airline did, was seek more information about the Plaintiffs, some of whom had engaged in highly suspicious activity.

_____

[3] "But in this case we have four completely silly elements of suspicion. . . ."  (2/6/09 Mot. Hrg. Garcia, 46).

24

Nevertheless, given that Defendant American Airlines did remove the Plaintiffs (and all the other passengers) from the plane, the analysis of Defendant's conduct comes under 49 U.S.C. § 44902–whether it properly exercised its discretion to remove a passenger based on the facts and circumstances known to the decision-maker at the time he or she made the decision. *See Christel*, 222 F. Supp. 2d at 340; *Williams*, 509 F.2d at 948. "The decision is not to be tested by other facts later disclosed by hindsight." *Sedigh v. Delta Airlines*, 850 F. Supp. 197, 201 (E.D.N.Y. 1994) citing *Williams*, *supra*.

The Court further concludes that Plaintiffs' state claims: Count VI, false imprisonment; Count VII, intentional infliction of emotional distress; and Count VIII, negligence,  must be dismissed because they are preempted by federal law.

In *Ruta v. Delta Airlines*, 322 F. Supp. 2d 391 (S.D.N.Y. 2004), the Court dismissed the plaintiff's claims for negligence, negligent and intentional infliction of emotional distress, and wrongful imprisonment because they all "stem from Captain Coffey's decision to remove Plaintiff from the airplane."

In the instant case, the Court concludes that all the state claims arise from Captain Plummer's decision to return to the gate, deboard all the passengers, and request police to question the Plaintiffs, who were traveling together, due to the suspicious activity of some of the Plaintiffs.

The Court finds that the same safety concerns that justified Captain Plummer's return to the gate, are the same concerns that caused him to request assistance of police to talk to the Plaintiffs. Captain Plummer's decision to return to the gate, based on the information he received provided to him by the crew, to seek more information about the suspicious situation was not arbitrary and capricious, and not discriminatory.

For the reasons stated above, this Court **GRANTS** Defendant's Motion for Summary Judgment. (Doc. No. 62).

SO ORDERED.


s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: September 3, 2009

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on September 3, 2009.


s/Denise Goodine
Case Manager